## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MARK W. DOBRONSKI**,                    Case No.   **5:23-cv-10331**

           Plaintiff,             Honorable Judith E. Levy
                                          United State District Judge
v.
                                          Honorable Anthony P. Patti
**TOBIAS & ASSOCIATES INC.**,             United States Magistrate Judge
d/b/a **GETMEHEALTHCARE.COM**,
d/b/a **ENROLLMENT CENTER**,

**FIDELITY LIFE ASSOCIATION**,

**GREAT WESTERN INSURANCE COMPANY**,

**MICHAEL CHARLES TOBIAS**,

**ROBERT D. PHILLIPS JR.**,
a/k/a **ROBERT D. MEEGAN**,
a/k/a **ROBERT D. OLIVERI**,

**JESSE ROBERT VENTURA**,

           Defendants.
_____

## FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, MARK W. DOBRONSKI, appearing *in propria*

*persona*, and for his amended complaint against Defendants alleges:

1. This matter arises under the Telephone Consumer Protection Act of 1991

1

("TCPA"), 47 U.S.C. § 227, *et seq.*, the Michigan Telephone Companies as Common Carriers Act ("MTCCCA"), M.C.L. § 484.101, *et seq.*, the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.101, *et seq.,* and the Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059, *et seq*.

<u>**Parties**</u>

2.  Plaintiff is an individual, of the age of majority, a citizen of the United States of America, is domiciled in and has a place of business in Orange County, Florida, has a place of residence and business Lima Township, Washtenaw County, Michigan, and has a place of business in the City of Westland, Wayne County, Michigan.

3. Upon information and belief, Defendant TOBIAS & ASSOCIATES INC. ("T&A"), is a corporation organized and existing under the laws of the State of Florida, with a principal office being located at 123 Northwest 13th Street, Suite 101, Boca Raton, Florida 33432-1639.

4.  Upon further information and belief, T&A transacts business using the fictitious business names of GETMEHEALTH CARE.COM and ENROLLMENT CENTER.

5. Upon information and belief, Defendant FIDELITY LIFE ASSOCIATION ("Fidelity"), is a corporation organized and existing under the laws of the State of

Illinois, with its principal office being located at 8700 West Bryn Mawr Avenue, Suite 900S, Chicago, Illinois 60631-3508, that is qualified to business and does business in the state of Michigan as an insurance company, and has a resident agent in the state of Michigan with a registered office located at 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170-4675.

6. Upon information and belief, Defendant GREAT WESTERN INSURANCE COMPANY ("Western") is a corporation organized and existing under the laws of the state of Iowa, with its principal office being located at 601 6th Avenue, Des Moines, Iowa 50309-1605, that is qualified to do business and does business in the state of Michigan as an insurance company, and has a resident agent in the state of Michigan with a registered office located at 2900 West Road, Suite 500, East Lansing, Michigan 48823-6386.

7. Upon information and belief, Defendant MICHAEL CHARLES TOBIAS ("Tobias") is an individual, of the age of majority, is mentally competent, is not in the military service, and resides at 1320 Ocelot Road, Venice, Florida 34293-6674.

8. Upon information and belief, Defendant ROBERT D. PHILLIPS JR. ("Phillips") is an individual, of the age of majority, is mentally competent, is not in the military service, and resides at 10775 Sunset Ridge Circle, Boynton Beach, Florida 33473-4867.

9.   Upon further information and belief, Phillips is also known as ROBERT D. OLIVERI and ROBERT D. MEEGAN.

10.   Upon information and belief, Defendant JESSE ROBERT VENTURA ("Ventura") is an individual, of the age of majority, is mentally competent, is not in the military service, and resides at 8329 Trent Court, Apartment D, Boca Raton, Florida 33433-8504.

## **Jurisdiction**

11.   This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

12.   This Court has limited personal jurisdiction over Defendants T&A, Fidelity, and Western pursuant to M.C.L. § 600.715, as a result of the defendant transacting any business within the state; and/or doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort; and/or contracting to insure any person, property, or risk located within this state at the time of contracting.

13.   In addition, Defendants Fidelity and Western are each licensed, pursuant to M.C.L. § 500.402, *et seq.*, by the Michigan Department of Insurance and Financial Services ("MDIFS") to act as insurers and to transact insurance in the state of Michigan, and do regularly transact insurance in the state of Michigan.

4

14.   This Court has limited personal jurisdiction over Defendants Tobias, Phillips, and Venura pursuant to M.C.L. § 600.705, as a result of the defendants transacting any business within the state; and/or doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort; and/or contracting to insure any person, property, or risk located within this state at the time of contracting.

15.   In addition, Defendants T&A, Tobias, Phillips, and Ventura each are licensed, pursuant to M.C.L. § 500.1201a, *et seq.*, by the MDIFS to act as insurance producers to sell, solicit, and negotiate insurance in the state of Michigan.

## Venue

16.   Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), as the tortious or illegal telephone calls complained of herein were received in this judicial district.

## Preliminary Statement

17.   As the Supreme Court recently explained, "Americans passionately disagree amount many things.  But they are largely united in their disdain for robocalls." *Barr v. American Association of Political Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

18.  The Federal Government receives a staggering number of complaints about

robocalls – 3.7 million complaints in 2019 alone.  *Id.*

19. In response to widespread public outrage over intrusive telemarketing calls to homes and businesses, the United States Congress acted to prevent persons, like Defendant, from invading American citizen's privacy and to prevent abusive "robocalls" by enacting the TCPA.

20.   According to the Federal Communications Commission ("FCC"), "unwanted calls and texts are the number one complaint to the FCC."

21.   In regard to such telephone solicitations, Senator Hollings of South Carolina, the primary sponsor of the TCPA, explained, "computerized calls are the scourge of modern civilization.  They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall... these computerized telephone calls threaten our personal safety... These machines are out of control, and their use is growing by 30 percent every year.  It is telephone terrorism, and it has got to stop...." See *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 17 FCC Rcd. 17459, 17474, fn. 90 (2002), quoting 137 Cong. Rec. 30,821-30,822 (Nov. 7, 1991).

22.  According to YouMail, Inc., a company which tracks robocall activity and publishes the YouMail Robocall Index, during calendar year 2023 alone, American

consumers were bombarded with over 55.05 *billion* robocalls; an average of over 166 robocalls to each man, woman, and child. [Source: www.robocallindex.com ].

23.  In 2021, nearly 1 in 3 Americans say they have fallen victim to a phone scam in the past year, with reported losses to phone scams exceeding $29.8 Billion. [Source: www.cndb.com/2021/06/29/americans-list-billions-of-dollars-to-phone-scams-over-the-past-year.html ].

24.  Congress has found that interstate telemarketing fraud has become a problem of such magnitude that the resources of the Government are not sufficient to ensure adequate consumer protection from such fraud.

25.  As a result, in enacting the TCPA, Congress intentionally created a legally enforceable bounty system, not unlike *qui tam* statutes, to incentivize the assistance of aggrieved private citizens to act as "private attorneys general" in enforcing federal law.

**Telephone Consumer Protection Act**

26.  In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and invasion of privacy to consumers specifically, but were also a threat to interstate commence generally.  *See* S. Rep. No. 102-178, at 2-3, 1991 U.S.C.C.A.N. 1968, 1969-71, 1991 WL 211220 (1991).

27.   The TCPA imposes restrictions on the use of automated telephone equipment including, *inter alia*, the use of recorded messages.  47 U.S.C. § 227(b)(1).

28.  Pursuant to authority delegated by Congress to the FCC under the TCPA at 47 U.S.C. § 227(b)(2), the FCC has adopted regulations to implement the aforesaid restrictions on use of automated telephone equipment. The TCPA implementing regulations are promulgated at 47 C.F.R. 64.1200(a), *et seq.*

29.  As part of the restrictions on use of automated telephone equipment, Congress created a private right of action for aggrieved persons to received $500.00 in damages for *each* violation of the subsection of the statute or the regulations prescribed thereunder, which amount the court may treble if the court finds that the defendant willfully or knowingly violated the statute or the regulations. 47 U.S.C. § 227(b)(3).

30.  Additionally, the Congress also sought to protect subscriber privacy rights, and delegated to the FCC authority to initiate a rulemaking proceeding and to adopt to implement methods and procedures that the FCC determines are most efficient to accomplish the need to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.  47 C.F.R. § 227(c)(1).  The FCC conducted such a rulemaking and implemented regulations to protect telephone subscribers' privacy rights.  See *In re Rules and Regulations Implementing the*

*Telephone Consumer Protection Act of 1991*, 68 FR 44144, 2003 WL 21713245 (July 25, 2003). The regulations implemented by the FCC are promulgated at, *inter alia*, 47 C.F.R. § 64.1200(c), *et seq.*, 47 C.F.R. § 64.1200(d), *et seq.*, and 47 C.F.R. § 64.1601(e).

31. As part of the protection of subscriber privacy rights, Congress created a private right of action for aggrieved persons to receive $500.00 in damages for *each* violation of the subsection of the statute or the regulations prescribed thereunder, which amount the court may treble if the court finds that the defendant willfully or knowingly violated the statute or the regulations. 47 U.S.C. § 227(c)(5).

32. The FCC has declared that telephone subscribers who have listed their wireless telephone number on the national do-not-call list are deemed to be "residential subscribers". *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 FCC Rcd. 14014, 14039, ¶ 36 (2003).

### Michigan Home Solicitation Sales Act

33. The Michigan Legislature has also enacted statutes governing and restricting telephone solicitors from making or causing to be made a telephone solicitation to a residential telephone subscriber. The restrictions include a prohibition on telephone solicitations using in whole or in part a recorded message. M.C.L. §

445.111(a)(1).  A telephone solicitor shall not make a telephone solicitation to a residential telephone subscriber whose name and residential telephone number apepars on the national do-not-call list. M.C.L. § 445.111(a)(4). Telephone solicitors must properly identify themselves and their organization.  M.C.L. § 445.111b(1) and (2).  Telephone solicitors may not block or otherwise interfere with the caller ID function of the telephone.  M.C.L. § 445.111b(3).  Further, telephone solicitors may not engage in specified unfair or deceptive acts or practices as set forth in the act. M.C.L. § 445.111c.

34.  The MHSSA provides that a person who suffers a loss as a result of violation of the MHSSA may bring an action to recover actual damages or $250.00, whichever is greater, together with reasonable attorney fees.  M.C.L. § 445.111c(3).

## Michigan Telephone Companies as Common Carriers Act

35.  The Michigan Legislature has enacted statutes prohibiting callers from using a telephone line to contact a telephone subscriber in the state at the subscriber's residence, business, or toll-free telephone number for the purpose of presenting, delivering, or attempted to deliver commercial advertising except when the subscriber has voluntarily requested, consented, permitted, or authorized the contact from the caller. M.C.L. § 484.125(2).

36.  The MTCCCA provides that a subscriber contacted by a caller in violation

10

of the MTCCCA may bring an action to recover damages of $1,000.00, together with reasonable attorneys' fees. M.C.L. § 484.125(5).

### Florida Telemarketing Sales Act

37.   The Florida Legislature has enacted statutes governing and restricting telephone solicitors in making telephone sales calls.  The statute includes, *inter alia*, requirements for identification of telephone solicitors and the transmission of caller identification information, prohibitions on the use of automated systems for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party, prohibitions on calling telephone numbers appearing on the national do-not-call registry or where a person has previously communicated to the telephone solicitor or other person that he or she does not wish to receive an outbound telephone call, text message, or voicemail transmission.  Fla. Stat. § 501.059.

38.   The FTSA provides that a called party who is aggrieved by a violation of the section may bring an action to, *inter alia*, recover actual damages or $500, whichever is greater.  Fla. Stat. § 501.059(10)(a).  Further if the court finds that the defendant's violations were willful or knowing, the court may, in its discretion, treble the amount of the award.  Fla. Stat. § 501.059(10)(b).

**General Allegations**

39.   Plaintiff's telephone lines have been besieged with telemarketing calls hawking such things as alarm systems, Google listings, automobile warranties, health insurance, life insurance, credit cards, and even financial miracles from God.   Some calls are blatant scams, including calls purportedly from the Social Security Administration, the U.S. Drug Enforcement Administration, and other government agencies, claiming that arrest warrants have been issued against Plaintiff for alleged drug trafficking and money laundering activities.

40.   Plaintiff's residential telephone numbers are 734-***-1000, 734-***-1212, and 734-***-2424.

41.   Plaintiff's residential telephone number 734-***-1000 is listed on the National Do Not Call Registry maintained by the United States Federal Trade Commission pursuant to 16 C.F.R. Part 310 and have been so listed continuously since at least May 27, 2022 and at all times subsequent thereto.

42.   Plaintiff's residential telephone numbers 734-***-1212 and 734-***-2424 are each listed on the National Do Not Call Registry maintained by the United States Federal Trade Commission pursuant to 16 C.F.R. Part 310 and have been so listed continuously since at least June 29, 2003 and at all times subsequent thereto.

43.   By listing his residential telephone numbers on the National Do Not Call

Registry, Plaintiff has given constructive notice to the world, including each and every one of the Defendants, that Plaintiff does not wish to receive telephone solicitations or robocalls at his residential and/or cellular telephone numbers.

44.    Courts are legally bound to give great deference to the FCC's interpretations of the TCPA and its own regulations.

45.   The FCC has issued a declaratory ruling defining "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02–278, WC Docket No. 07–135, FCC 15–72, 2015 WL 4387780, at *26 ¶ 73 (FCC July 10, 2015).

46.   Plaintiff is  a customary user of the called telephone lines, is the one that was the actual recipient of the telephone calls at issue in this complaint, and suffered the nuisance and invasion of privacy of same.  Thus, Plaintiff has standing to bring this action for alleged violations of TCPA's robocall provisions.  See *Leyse v. Bank of America Nat. Ass'n*, 804 F.3d 316, 324 (C.A.3, 2015).

47.   At no time relevant hereto has Plaintiff or any other authorized person requested, consented, permitted, or authorized the contact from the Defendants.

48.   At no time has Plaintiff provided permission to the Defendant to engage

in telephone solicitation with the Plaintiff via telephone.

49.   At no time has Plaintiff provided "prior express written consent" (as that terms is defined under the TCPA and as interpreted by the FCC) for any of the Defendants or anyone acting on behalf of the Defendants to initiate any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to Plaintiff's residential telephone number.

50.   At no time has Plaintiff had an "established business relationship" (as that term is defined under the TCPA and as interpreted by the FCC) with any of the Defendants.

51.   The FCC has declared that purporting to receive consent during a call does not constitute the *prior* consent necessary to deliver the message in the first place, as the request is part of the telemarketing. See *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14019, 2003 WL 21517853, at *49, ¶ 142 (June 26, 2003).

52.   The FCC has clarified that sellers may be held vicariously liable for violations of the TCPA by third-party telemarketers that initiate calls to market the seller's products or services, declaring as follows:

> "[A] company on whose behalf a telephone solicitation is
> made bears the responsibility for any violation of our

> telemarketing rules and calls placed by a third party on
> behalf of that company are treated as if the company itself
> placed the call."

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act*

*of 1991*, Declaratory Ruling, 20 FCC Rcd 13664, 13667, ¶ 7 (2005).

53. A seller may be liable for violations by its representatives under a broad

range of agency principles, including not only formal agency, but also principles of

apparent authority and ratification. *In re Dish Network,* 28 FCC Rcd. 6574, 6584, ¶

28 (2013).

54.  Pursuant to 47 U.S.C. § 217, the act, omission, or failure of any officer,

agent, or other person acting for or employed by an common carrier or user, acting

within the scope of his employment, shall in every case also be deemed to be the act,

omission, or failure of such carrier or user as well as that of the person.

55.  When considering individual corporate officer liability, other Courts have

agreed that a corporate officer involved in the telemarketing at issue may be

personally liable under the TCPA.  *See, e.g., Jackson Five Star Catering, Inc. v.

Beason,* No. 10-10010, 2013 U.S. Dist. LEXIS 155985, *10 (E.D. Mich. Nov. 8,

2013) ("[M]any courts have held that corporate actors can be individually liable for

violating the TCPA where they had direct, personal participating in or personally

authorized the conduct found to have violated the statute.") (internal citation

omitted); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D.MD. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

56.   It is well settled under both Michigan and Florida law that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation.  A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent for the corporation and not on his own behalf.

57.   Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words or may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each become subject to liability for the acts of the others, as well as for his own acts. In either case, the defendant's embrace of the actor's purpose or design—whether by agreement or by action—renders the defendant liable for the underlying tort.

58.   The liability of coconspirators to civil damages is joint and several. All

those who, in pursuance of a common plan to commit a tortious act actively take part in it and further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with him.

59. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of invasion of privacy and intrusion on Plaintiff's right of seclusion.

60. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of the occupation of the telephone line by unwelcome calls, making the phone unavailable for legitimate callers or outgoing calls, including emergency calls, when the telephone line was seized by Defendant's calls.

61. For each and every call alleged herein initiated to Plaintiff's telephone line, Defendants caused an injury in the form of a nuisance and annoyance to the Plaintiff. For calls that were answered, Plaintiff had to go to the unnecessary trouble of answering them. Even for unanswered calls, Plaintiff had to deal with missed call notifications and call logs that reflected the unwanted calls. This also impaired the usefulness of these features on Plaintiff's telephone, which features are designed to inform the user of important missed communications.

62. Each and every call placed without consent by Defendants alleged herein

17

to Plaintiff's telephone lines resulted in the injury of a trespass to Plaintiff's chattel, namely Plaintiff's telephone line and its telephone services.

63.  For purposes of the TCPA, the FCC has defined "willfully or knowingly" to mean that the violator knew that he was doing the act in question, in this case, initiating a telephone solicitation, irrespective  of any intent to violate the law.  A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance.

### Allegations Specific to this Complaint

64.  Defendant T&A is in the business of distributing insurance products.

65.   Defendant Tobias is the chief executive officer of T&A, personally authorized, directly, had control over, and participated in the activities of T&A, including its telemarketing activities complained of herein, and at all times had the the ability to cease such activities.

66.  Defendants Phillips and Ventura (hereinafter the "Agents") are each either employees or authorized agents of T&A.

67.  T&A uses a multi-level marketing scheme termed a "National Marketing Organization" ("NMO") that is well-established within the insurance industry.

68.  Under this model, NMOs contract directly with insurance carriers, in this case Fidelity and Western (collectively, the "Insurance Companies") who then

provide insurance products that are sold through the NMO.

69. The NMO then employs either employees or independent contractors, commonly known as "agents", who market and distribute the carrier's insurance products to consumers.

70. As in a typical multi-level marketing scheme, agents can recruit other agents to become part of their selling organization at the NMO. The selling organization above or beneath a particular agent is commonly referred to, respectively, as that agent's "upline" or "downline."

71. An enrolled agent is eligible to earn commission's through the NMO's compensation plan for any insurance product that the agent sells, after the NMO first deducts its commission from the sale of the Insurance Companies' products.

72. The enrolled agent also earns commissions on insurance products sold by the enrolled agent's "downline" agents.

73. As part of its marketing program, T&A sells or provides telemarketing "leads" of consumers to its agents.

74. In addition to telemarketing leads, T&A also provides its agents with access to automatic telephone dialing platforms and services to facilitate telephoning consumers *en masse* to market the T&A's Insurance Companies' products.

75. These automatic telephone dialing platforms can store lists of telephone

numbers (and, often, personal information) of consumers and use a random number or sequential number generator which has the capacity to select and initiate calls to persons from the stored lists of telephone numbers with no human involvement and only route the call to a telemarketing agent when a called person has actually answered the call.

76. T&A and Tobias promote telemarketing to its agents as being essential if the agents want to be successful in marketing T&A's Insurance Companies' products, and that the "high quality" leads and automatic telephone dialing platforms supplied by T&A will facilitate the agent being successful.

77. T&A, Tobias, the Agents, and the Insurance Companies are well aware of the TCPA and its restrictions upon telemarketing.

78. T&A, Tobias, the Agents, and the Insurance Companies are well aware that the automatic telephone dialing platforms and telemarketing activities which it directs its agents to utilize are illegal and violate the TCPA.

79. The call centers initiating the automated telemarketing calls on behalf of T&A are believed to be located outside the United States, and have been so selected so as to be outside the reach of United States laws and law enforcement authorities.

80. The call centers, in turn, hire individuals to act as lead generators – known in telemarketing parlance as "ropers" – to pre-qualify called consumers as to whether

the consumer meets the qualification criteria for specific insurance products.

81.   The lead generator or "roper" will engage in deceptive and illegal techniques to solicit consumers, including, *inter alia*: manipulating the caller identification such that the caller cannot be easily identified or called back; identifying with a false or generic-sounding business name; deliberately calling telephone numbers which appear on the National Do Not Call Registry; refusing to provide identifying information to the called party upon inquiry; uttering profanities to or otherwise threatening or harassing the called party if the consumer does not cooperate by expressing interest or providing requested personal information or the called party requests not to be called.

82.   Once a lead generator or "roper" has a consumer who meets the qualification criteria – referred to in telemarketing slang as the "mark" – the lead generator will then live transfer the call to an agent who will then attempt to close the sale of the insurance product to the consumer.  It is usually only late at this stage that a called party might learn any identifying information as to the source of the telephone call.

83.  When the lead generator or "roper" has a consumer who fails to meet the qualification criteria, the lead generator will immediately hang up without warning.

84.  T&A, Tobias, the Agents, and the Insurance Companies all are well aware

of the illegal tactics being used by their contracted call centers, but are deliberately indifferent to what is occurring and engage in willful blindness so as to be able to represent that they are "unaware" of the illegal telemarketing conduct.

85. The Insurance Companies support and facilitate the scheme by, *inter alia*, providing the T&A and its Agents with access to the Insurance Companies' computer systems for pricing; the ability to enter data into the Insurance Companies' systems; the authority to use the Insurance Companies' trade name and trademark or service mark; and, of course, the authority to market the Insurance Companies' insurance products.

86. The Insurance Companies ratify the conduct by accepting the benefits (i.e., the applications for insurance and resultant premiums earned from the insurance policies issued) realized from the telemarketing activity.

87. In the past 12 months alone, Plaintiff has received well over 500 telephone calls from telemarketers who have falsified or "spoofed" their caller identification and who have identify as being with "Senior Benefits", "American Benefits", "Medicare Benefits" or similar generic sounding names, and during which call where Plaintiff was unable to develop the true identify of the ultimately responsible seller.

88. Because the telemarketers engage in such deceptive practices designed to conceal their actual identities, Plaintiff has had to engage in various investigative

techniques to identify the sources of the telemarketing calls being received.

89. One investigative technique utilized by Plaintiff is termed a "canary trap", wherein Plaintiff provides false, but unique, identifying information during each received call, in particular a unique name. If and when that unique information surfaces at a later date, a tie-in between the two events, and hence the ability to identify the source call, is able to be made.

90. As discovery progresses in this case and Plaintiff is able to learn the identity or identities of the call centers that Defendants have utilized to initiate the telephone solicitations, Plaintiff will seek to amend this complaint to add the call centers as additional named defendants.

91. Also as discovery progresses in this case, Plaintiff anticipates learning of additional telephone solicitation calls for which Defendants or Defendants' agents are responsible, at which time Plaintiff will seek to amend this complaint to supplement the damages claims.

92. Because each of the Defendants were acting in concert and embraced the purpose and design of the tortious telemarketing scheme, renders each of the Defendants jointly and severally liable for the underlying tortious conduct.

### <u>Calls 1 - 12</u>

93. On the following dates and times, Defendants or Defendants' agents

initiated calls to Plaintiff's residential telephone numbers, as indicated, using an artificial or pre-recorded voice message, without prior express consent, and there being no emergency, and displaying the caller identification number ("Caller ID") and caller identification name ("CLID Name") as shown.

| Call | Date | Time | Called # | Caller ID | CLID Name |
|------|------|------|----------|-----------|-----------|
| 1 | 04/20/2022 | 13:38 | 734-***-2424 | 734-416-7676 | V42013390801174 |
| 2 | 06/23/2022 | 17:24 | 734-***-1000 | 734-535-9320 | |
| 3 | 06/24/2022 | 11:22 | 734-***-1212 | 269-236-3252 | |
| 4 | 07/06/2022 | 12:22 | 734-***-1212 | 734-234-1206 | V70612221900000 |
| 5 | 07/29/2022 | 15:21 | 734-***-1212 | 734-420-1150 | PLYMOUTH MI |
| 6 | 08/18/2022 | 13:22 | 734-***-2424 | 734-423-4491 | WAYNE MI |
| 7 | 08/23/2022 | 12:45 | 734-***-1212 | 734-228-7976 | |
| 8 | 09/13/2022 | 17:54 | 734-***-1212 | 734-420-1922 | R TEMMERMAN |
| 9 | 10/05/2022 | 16:26 | 734-***-1000 | 734-921-0856 | |
| 10 | 10/25/2022 | 10:36 | 734-***-1000 | 734-871-6942 | |
| 11 | 12/06/2022 | 15:39 | 734-***-1000 | 734-872-6926 | |
| 12 | 02/02/2023 | 12:33 | 734-***-1000 | 734-872-6934 | |

94. Upon Plaintiff answering each of Calls 1 through 12, *supra*, by saying "hello," Plaintiff would then note silence for approximately 4-5 seconds and then hear a pre-recorded voice message which begins:

> "Hello. This is James. I am with American Benefits on a recorded line. How are you doing today? [Delay.] Great! I am calling to inform you about a new low cost final expense insurance plan that's going to cover a hundred percent of your final expenses."

95. The pre-recorded voice message then engages the called party with an interactive voice response ("IVR") system which asks pre-qualifying questions of the

24

consumer including, *inter alia*, age, beneficiary, and zip code.

96. Callers who fail to meet the pre-qualification criteria are simply hung-up upon.

97. Called parties who meet the pre-qualification criteria are then automatically transferred to a "senior verifier" who verifies the prior IVR responses and then asks additional questions including, *inter alia*, name, date of birth, address, Social Security Number, and bank account information.

98. During the "verification" process, called parties who fail to meet pre-qualification criteria or who refuse to provide requested information are suddenly hung-up upon so that the "senior verifier" can immediately move on to another held call.

99. For those consumers who pass the "verification" process, the call is then transferred to a licensed insurance agent who them will attempt to sell the called party a final expense life insurance policy.

100. On each of the twelve (12) calls (Calls 1 through 12) listed in paragraph 93, *supra*, in order to attempt to better identify the source behind the automated pre-recorded messages, Plaintiff would engage in the pre-qualification and qualification process and utilize an investigative process known as a "canary trap" by providing controlled information, including a false name, etc.

101. During each of the calls, except Call 12 on February 2, 2023, Plaintiff would get to various different steps of the process and then, suddenly, be hung up upon without warning and without having better identified the source of the call.

102. On each occasion, immediately after the termination of the call, Plaintiff would dial back the Caller ID telephone number displayed, and on each occasion the telephone number was either disconnected or, on one occasion, was a private telephone number of an individual whose number was apparently falsely "spoofed" by the caller.

103. The fact that the caller identification information provided in each of the calls was manipulated to display false information evidences willful and knowing conduct on the part of the callers.

104. The fact that each of Calls 1 through 12 utilized the identical pre-recorded message evidences that the same person was responsible for the initiation of each call.

105. During the course of Call 12 on February 2, 2023, Plaintiff successfully got past the IVR pre-qualification process, and the "verification" process with the "senior verifier", and was ultimately connected to a licensed insurance agent who identified himself as Jesse Ventura with "The Enrollment Center."

106. Ventura first solicited Plaintiff for a $10,000 life insurance policy with a premium of $104 per month issued by Fidelity.

107. Ventura then solicited Plaintiff for a $14,000 life insurance policy with a premium of $100 per month issued by Western.

108. As Ventura was asking for Plaintiff's bank account information, the call suddenly disconnected and Plaintiff received a recorded message which stated: "You have been kicked from this conference."

### Call 13

109. On February 2, 2023, at 12:44 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line 734-***-1000.

110. The caller identification number displayed was 954-280-2920.

111. Upon answering the call, Plaintiff was again speaking with Ventura.

112. Ventura stated that he did not know what happened, and resumed the telephone solicitation.

113. Ventura then requested, and Plaintiff provided Ventura, a *faux* name of Kevin McAllister, and provided, *inter alia*, a false date of birth and Social Security Number, mailing address, email address, and bank account information.

114. Ventura then sold Plaintiff a policy with Western.

115. Plaintiff attempted to get Ventura to better identify his company, and Ventura identified by the generic name of "The Enrollment Center" and offered that they were located in Florida.

27

116.   Ventura briefly put Plaintiff on hold in order to connect Plaintiff to the "compliance department."  During the brief hold, a recorded message stating: "I want to thank you for choosing GETMEHEALTHCARE.COM" played.

117.   Plaintiff was then transferred to an individual who identified himself as "Eric" with "GETMEHEALTHCARE.COM".

118.   "Eric" then repeated the "canary trap" information which Plaintiff had provided to Ventura and asked Plaintiff to verify same.

119.   Eric then stated that he was emailing an application to Plaintiff.

120.   On February 2, 2023, at 1:09 P.M., while Plaintiff remained on the telephone with Eric, Plaintiff received an email from Western, which email was signed by a Robert D. Phillips, which included an application for individual life insurance policy on a Western form which was pre-filled with the "canary trap" information which Plaintiff had provided minutes earlier to Ventura, and seeking the electronic signature of Plaintiff.

121.   The Western application includes a certification signature by Phillips that the answers on the form were recorded correctly.  The Western application, appearing on Western letterhead, named Robert D. Phillips, with an email address of phillipsma@getmehealthcare.com, as being an authorized agent of Western.

122.   Since Plaintiff did not know who Phillips was, and Phillips had not

participated in the telephone call so as to be able to properly certify that the answers were recorded correctly, Plaintiff inquired of Eric, who explained that Phillips was his manager and that they were located in Florida.

123. The fact that Western directly emailed the application to Plaintiff, the application was on Western letterhead, and the application indicated that Phillips was the authorized agent, all evidence that T&A, Ventura, and Phillips have apparent, if not actual, authority from Western to market Western insurance products.

124. The fact that Western sent an email to Plaintiff seeking Plaintiff's electronic signature on the application evidences an attempt by Western to reap the benefits of, and hence ratify, the actions of T&A, Ventura, and Phillips.

125. Plaintiff experienced problems getting the Western application form that had been received via email to fully open on his computer which Eric attributed to problems with the Adobe Reader software.

126. Eric then informed Plaintiff that he was completing an application for Plaintiff to obtain life insurance in the amount of $10,000.00 from Fidelity.

127. Eric then went through a telephone verification process for the Fidelity application.

128. On February 2, 2023, at 1:19 P.M., Plaintiff received an email from Fidelity at the "canary trap" email address provided to Defendants which included a

29

copy of a Fidelity application for life insurance which was pre-filled with the "canary trap" information which Plaintiff had provided to Defendants, and included the electronic signature of Michael Charles Tobias as being the writing agent.

129.  Immediately after termination of Call 13, Plaintiff dialed the telephone number displayed in the caller identification information (954-280-2920) in order to make a do-not-call demand.  The dialed number would not ring and, after approximately 15 seconds went to reorder.

130.  On February 2, 2023, at 1:25 P.M., Plaintiff received an email from Fidelity at the "canary trap" email address which stated that the application had been "cancelled to edit application."

131.  Shortly thereafter, Plaintiff received, via U.S. Mail, a letter from Fidelity, on Fidelity letterhead, dated February 3, 2023, advising that Policy Number 0101409508 had been issued to Kevin McCallister, identifying Michael Charles Tobias as the authorized agent, and providing payment instructions.

132.  The fact that Fidelity issued a policy and sent a letter seeking payment evidences that T&A, Ventura, and Tobias had apparent, if not actual, authority from Fidelity to market Fidelity insurance products on behalf of Fidelity, and further evidences that Fidelity was ratifying the conduct by attempting to reap the benefits of the calls.

## COUNT I
## VIOLATION OF THE TCPA - ROBOCALL

133.  Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra.*

134.  Each of Calls 1 through 12, *supra*, were in violation of the TCPA and its implementing regulations, specifically 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3), as Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party and there being no emergency.

135.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT II
## VIOLATION OF THE TCPA - ABANDONED CALL

136.  Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra.*

137.  Each of Calls 1 through 12, *supra*, violated the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(a)(7), as Defendants or Defendants' agent's abandoned the call by not connecting the call to a live sales representative within two (2) seconds of the called person's completed greeting.

138.  The fact that twelve (12) calls out of twelve (12) calls in a row from Defendants or Defendants' agent were not answered live by an individual plausibly

suggests that more than three percent of all telemarketing calls initiated by Defendants or Defendants' agents are abandoned.

139. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT III
## VIOLATION OF THE TCPA - NO PRERECORDED IDENTIFICATION

140. Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra.*

141. Each of Calls 1 through 12, *supra*, violated the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(a)(7)(i)(A) as Defendants or Defendants' agent, upon the call not connecting to a live sales representative within two (2) seconds of the called person's completed greeting, did not provide a prerecorded identification and opt-out message.

142. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT IV
## VIOLATION OF THE TCPA - NO AUTOMATED OPT-OUT

143. Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra.*

144. Each of Calls 1 through 12, *supra*, violated the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(a)(7)(i)(B) as Defendants or Defendants' agent, upon the call not connecting to a live sales representative within

two (2) seconds of the called person's completed greeting, did not provide an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make a do-not-call request prior to terminating the call.

145.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT V
## VIOLATION OF THE TCPA - DO NOT CALL

146.  Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra*.

147.  Each of Calls 1 through 13, *supra*, were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(c)(2), as Defendants or Defendants' agent initiated a telephone solicitation to a residential telephone subscriber who has registered his telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

148.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT VI
## VIOLATION OF THE TCPA - FALSE IDENTITY

149.  Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra*.

150.  Each of Calls 1 through 13, *supra*, were in violation of the TCPA

implementing regulations, specifically 47 C.F.R. § 64.1200(d)(4), as Defendants or Defendants' agent did not provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and/or a telephone number or address at which the person or entity may be contacted.

151. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT VII
## VIOLATION OF THE MTCCCA

152. Plaintiff incorporates the allegations of paragraphs 1 through 132, supra.

153. Each of Calls 1 through 12, *supra*, were in violation of the MTCCCA, specifically M.C.L. § 484.125(2)(b), as Defendants or Defendants' agent delivered or attempted to deliver intrastate commercial advertising having activated a feature to block the display of caller identification information that would otherwise be available to the subscriber, to wit: an accurate caller identification number that would allow the called party to call to make a do-not-call demand.

154. Calls 1 through 12 each displayed a caller identification number beginning with area code 734 or 269, both of which are Michigan area codes, thus evidencing that the calls originated on the public switched telephone network in Michigan, and were placed to Plaintiff's telephone number with a Michigan area code; thus making the calls intrastate.

34

## COUNT VIII
## VIOLATION OF THE MHSSA

155.  Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra.*

156.  Each of Calls 1 through 13, *supra*, were in violation of the MHSSA, specifically M.C.L. § 445.111a(5), as Defendants or Defendants' agent made a telephone solicitation to a residential telephone subscriber whose name and residential telephone number is on the federal do-not-call list; and/or M.C.L. 445.111b(1), as the person making the telephone solicitation did not state his or her name and the full name of the organization or other person on whose behalf the call was initiated; and/or M.C.L. 445.111b(3), as the telephone solicitor intentionally blocked or otherwise interfered with the caller identification function on the telephone of a residential telephone subscriber to whom a telephone solicitation is made so that the telephone number of the caller is not displayed on the telephone of the residential telephone subscriber.

## COUNT IX
## VIOLATION OF THE FTSA

157.  Plaintiff incorporates the allegations of paragraphs 1 through 132, *supra.*

158.  Each of Calls 1 through 13, *supra*, were in violation of the FTSA: specifically Fla. Stat. § 501.059(2), as Defendants or Defendants' agent made an unsolicited telephonic sales call to a residential telephone number and did not identify

35

himself by his or her true first and last names and the business immediately upon making contact by telephone with the person who is the object of the telephone solicitation; and/or Fla. Stat. § 501.059(8)(a), Defendants or Defendants' agent made and allowed a telephonic sales call to be made involving the playing of a recorded message without the prior express written consent of the called party; and/or Fla. Stat. § 501.059(b), Defendants or Defendants' agent caused a telephonic sales call to be made to fail to transmit the originating telephone number and the name of the telephone solicitor to any caller identification service in use by a recipient of a telephonic sales call.

159.  The aforesaid violations of the FTSA were willful and/or knowing as is evidenced by the repeated number of calls, and the deliberate and overt actions which Defendants took in initiating the calls.

160.  The FTSA applies as the Defendants conducted the telephonic sales calls from a location in Florida at the time that each of the calls were made.

## PRAYER FOR RELIEF

WHEREFORE, the aforesaid premises considered, Plaintiff prays that this Court enter a judgment for Plaintiff and against the Defendants, jointly and severally, as follows:

A.     Damages:

i.     Damages for violations of the TCPA alleged:

| Count | Violations |
|-------|------------|
| I | 12 |
| II | 12 |
| III | 12 |
| IV | 12 |
| V | 13 |
| VI | 13 |

A total of 74 violations at $500 per violation for damages of $37,000.00, which amount shall be trebled because the violations were willful and/or knowing, for total damages of $111,000.00.

ii.    Damages for violations of the MTCCCA alleged at Count VII: 12 violations at $1,000 per violation, for damages of $12,000.00.

iii.   Damages for violations of the MHSSA alleged at Count VIII: 13 violations at $250 per violation, for damages of $3,250.00.

iv.   Damages for violations of the FTSA alleged at Count IX: 13 calls at $500 per violation, for damages of $6,500.00, which amount shall be

37

trebled because the violations were wilful and/or knowing, for total damages of $19,500.00.

The cumulative total amount of damages claimed in this action is $155,750.00,and in the event of default judgment is the sum certain damages amount that will be sought.

B.  An award of Plaintiff's taxable costs and disbursements incurred in the filing and prosecution of this action;

C.  An injunction enjoining Defendants from initiating any telephone calls to Plaintiff's residential telephone and cellular telephone lines.

D.  Interest accruing from the date of filing until paid at the statutory rate; and,

E.  Such other and further relief as this Court deems necessary, reasonable, prudent and proper under the circumstances.

Respectfully submitted,

Dated:  April 10, 2024

_____
Mark W. Dobronski
Post Office Box 222
Dexter, Michigan 48130-0222
Telephone: (734) 330-9671
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **April 10, 2024**, I electronically filed the foregoing *First Amended Complaint* with the Clerk of the Court via the Court's Pro Se Document Upload utility, which will send notification of such filing to all counsel of record via the CM/ECF system.

_____

Mark W. Dobronski