## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Mark W. Dobronski,

                Plaintiff,

v.

Tobias & Associates, Inc., *et al.*,

                Defendants.

_____/

Case No. 23-10331

Judith E. Levy
United States District Judge

Mag. Judge Anthony P. Patti

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS [49, 51, 52]

Plaintiff Mark W. Dobronski brings this pro se consumer protection suit against Tobias & Associates, Inc., Michael Tobias, Robert Phillips, Jesse Ventura, Fidelity Life Association, and Great Western Insurance Company, alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, the Michigan Telephone Companies as Common Carriers Act ("MTCCCA"), Mich. Comp. Laws § 484.101 *et seq.*, the Michigan Home Solicitation Sales Act ("MHSSA"), Mich. Comp. Laws § 445.101 *et seq.*, and the Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059. (ECF No. 47, PageID.585–586.)

On March 18, 2024, the Court issued an opinion and order adopting in part a report and recommendation from Magistrate Judge Patti, which recommended granting Defendants' first motions to dismiss. (ECF No. 46.) In this opinion, the Court granted Defendants' first motions to dismiss (ECF Nos. 29, 30, 31), dismissed Plaintiff's claim pursuant to 47 C.F.R. § 64.1601(e)(1) with prejudice, and directed Plaintiff to file an amended complaint. (ECF No. 46, PageID.583.)

Plaintiff filed his timely amended complaint on April 10, 2024. (ECF No. 47.) Before the Court are three motions to dismiss filed by Defendants in response to Plaintiff's amended complaint. (ECF Nos. 49, 50, 51, 52.) The motions are fully briefed. (ECF Nos. 53, 54, 55, 56, 57, 61.) For the reasons set forth below, Defendants' motions to dismiss are granted in part and denied in part.

## I.   Background

Plaintiff alleges that Defendant Tobias & Associates ("T&A") is an insurance distributor and "National Marketing Organization" ("NMO"). (ECF No. 47, PageID.602.) NMOs contract with insurance carriers (such as Defendants Fidelity Life Association ("Fidelity") and Great Western Insurance Company ("GWIC")) and employ agents to market and

2

distribute insurance products to consumers. (*Id.* at PageID.602–603.) T&A, as an NMO, provides its agents with "telemarketing leads" and access to automatic telephone dialing services. (*Id.* at PageID.603.) These automatic telephone dialing services initiate calls to telephone numbers generated by a random number generator or a sequential number generator. The calls are initiated without human involvement "and only route the call to a telemarking agent when a called person has actually answered the call." (*Id.* at PageID.603–604.)

T&A receives a commission when its agents sell an insurance product and provides a commission to the agent who sold the product. (*Id.* at PageID.603.) These agents are "either employees or independent contractors." (*Id.*) Agents may recruit other agents as part of the marketing scheme, and agents earn a commission for insurance products sold by the agents they recruited. (*Id.*)

Plaintiff alleges that the automatic telephone dialing services, which are utilized by T&A to initiate calls, consist of call centers believed to be located outside the United States. (*Id.* at PageID.604.) These call centers "hire individuals to act as lead generators," and they ask consumers questions and determine if the consumer meets certain

3

qualification criteria for the insurance products sold. (*Id.* at PageID.604–605.) If the consumer qualifies for the product, the lead generator will transfer the call to an agent, who then "attempt[s] to close the sale of the insurance product to the consumer." (*Id.* at PageID.605.) If the consumer does not qualify, the lead generator will hang up immediately, without warning. (*Id.*) Plaintiff alleges that the lead generators "engage in deceptive and illegal techniques to solicit consumers" and to obfuscate their and their employers' identity, such as using "a false or generic-sounding business name," "manipulating the caller identification such that the caller cannot be easily identified or called back," and "refusing to provide identifying information [] upon inquiry." (*Id.*) He also alleges that lead generators deliberately call telephone numbers that appear on the National Do Not Call Registry ("DNC Registry"). (*Id.*)

Plaintiff's suit is related to thirteen phone calls he received between April 20, 2022 and February 2, 2023. (*Id.* at PageID.608–611.) For Calls 1-12, Plaintiff answered the phone, heard silence for approximately four to five seconds, and then heard the following pre-recorded voice message:

> Hello. This is James. I am with American Benefits on a recorded line. How are you doing today? [Delay.] Great! I am calling to inform

4

you about a new low cost final expense insurance plan that's going to cover a hundred percent of your final expenses.

(*Id.* at PageID.608.) A pre-recorded voice then asked Plaintiff a variety of questions related to his qualification for the product, such as his age and zip code. (*Id.* at PageID.609.) If he passed this stage, presumably meaning he was pre-qualified for the product, he was transferred to a "senior verifier" who verified the prior responses and asked additional questions. (*Id.*) However, during Calls 1-11, the calls would suddenly disconnect during the pre-qualifying or qualifying stage. (*Id.* at PageID.610.)

Plaintiff alleges that he engaged in the pre-qualification and qualification process "in order to attempt to better identify the source behind the automated pre-recorded messages" and provided a fake name.[1] (*Id.* at PageID.609.) When Plaintiff attempted to call back the number displayed on the Caller ID, "the telephone number was either

---

[1] Plaintiff explains that he provided a fake name because he utilizes an "investigative technique" called "a canary trap," where he "provides false, but unique, identifying information during each received call, in particular a unique name. If and when that unique information surfaces at a later date, a tie-in between the two events, and hence the ability to identify the source call, is able to be made." (ECF No. 47, PageID.607.)

5

disconnected or, on one occasion, was a private telephone number of an individual whose number was apparently falsely 'spoofed' by the caller." (*Id.* at PageID.610.)

On February 2, 2023, Plaintiff answered Call 12 and passed the pre-qualifying and qualifying stage of the call. (*Id.*) He was transferred to Defendant licensed insurance agent who identified himself as "Jesse Ventura" "with 'The Enrollment Center" in Florida. (*Id.* at PageID.610–611.) Ventura solicited Plaintiff for life insurance policies issued by Fidelity and GWIC. (*Id.*) The call disconnected but Plaintiff received a call back a few minutes later and spoke to Ventura again ("Call 13"). (*Id.* at PageID.611.) Ventura "sold Plaintiff a policy with [GWIC]" and transferred him to "the compliance department." (*Id.* at PageID.611–612.)

Then, Plaintiff spoke with "Eric" at "GETMEHEALTHCARE.COM," who stated that he emailed Plaintiff an application. (*Id.* at PageID.612.) Plaintiff received an email "from [GWIC], which [] was signed by [] Robert D. Phillips, which included an application for individual life insurance policy on a [GWIC] Form which was pre-filled with the 'canary trap' information [that Plaintiff had

6

previously provided to Ventura]." (*Id.*) The application, which was on GWIC letterhead, "named Robert D. Phillips . . . as being an authorized agent of [GWIC]." (*Id.*) Eric explained that Phillips "was his manager and that they were located in Florida." (*Id.* at PageID.613.)

Plaintiff had issues with the emailed GWIC document, so Eric "informed Plaintiff that he was completing an application for Plaintiff to obtain life insurance . . . from Fidelity" and emailed him a copy of a Fidelity application for insurance, which included "the electronic signature of Michael Charles Tobias as being the writing agent." (*Id.* at PageID.613–614.)

After the call ended, Plaintiff received an email from Fidelity stating that his application had been "cancelled to edit application," but later received a letter on Fidelity letterhead, dated February 3, 2023, stating that the policy had been issued and providing payment instructions. (*Id.* at PageID.614.)

## II.    Legal Standard

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684

F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A pro se complaint is entitled to a liberal construction and "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## III.   Analysis

### A. Improper Group Pleading

Defendants argue that Plaintiff's amended complaint contains the same defects as his initial complaint. Specifically, Defendants believe the amended complaint improperly groups Defendants together and fails "to provide notice to each Defendant about what their roles were in the alleged unlawful conduct." (ECF No. 50, PageID.642–643; *see also* ECF No. 51, PageID.668 ("Plaintiff's allegations do not provide any defendant

with fair notice of what it is called upon to defend."); ECF No. 52, PageID.697–698 ("Plaintiff fails to provide GWIC with fair notice of the claims against it under Rule 8.").)

In the Court's March 18, 2024 order, the Court granted Defendants' motions to dismiss and allowed Plaintiff to file an amended complaint. (ECF No. 46, PageID.580.) The Court reasoned that Plaintiff's original complaint violated Federal Rule of Civil Procedure 8(a)(2) because it did not provide adequate notice of the claims against each Defendant.

As stated in the Court's March 18, 2024 order,

According to Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." "This rule requires that Plaintiff 'provide the [D]efendants "adequate notice of the claims against them and the grounds upon which each claim rests.""" (ECF No. 39, PageID.341 (quoting *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 392–93 (6th Cir. 2020) (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018))).)

A pleading violates Federal Rule of Civil Procedure 8(a)(2) when the "plaintiff failed to 'connect specific facts or events with the various causes of action [ ] asserted.'" *Lee*, 951 F.3d at 392 (quoting *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 947 (7th Cir. 2013)). A pleading may not provide adequate notice of the claims against a defendant when the complaint "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their

conduct." *Atuahene v. City of Hartford*, 10 Fed. Appx. 33, 34 (2d Cir. 2001); *see also Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) ("[W]e have found, in an unpublished opinion, that a complaint failed where a plaintiff 'did not allege that particular defendants performed the acts that resulted in a deprivation of [plaintiff's] constitutional rights. This is a requirement in Bivens actions such as this one.'" (quoting *Kesterson v. Moritsugu*, No. 96–5898, 1998 WL 321008, at *4 (6th Cir. June 3, 1998))).

(ECF No. 46, PageID.575–576.)

Here, the Court finds that Plaintiff's amended complaint provides adequate notice of the claims against each Defendant.

As an initial matter, Defendants argue that "the nine Counts [in the amended complaint] parallel the same manner in which they were pled in the original Complaint, with each Count being generically directed at 'Defendants or Defendants' agents.'" (ECF No. 50, PageID.642; *see also* ECF No. 51, PageID.668; ECF No. 52, PageID.698.) First, it is now clear that Plaintiff is bringing all counts against all Defendants. As the Court noted in the March 18, 2024 order, "[g]rouping the Defendants together in this manner is acceptable if there are sufficient facts alleged so that each Defendant has notice of what Plaintiff believes their role was in the described violations." (ECF No. 46, PageID.579.)

10

Plaintiff's amended complaint provides sufficient facts such that each Defendant has notice of what Plaintiff believes their role was in the described violations. Plaintiff alleges that T&A contracts with Fidelity and GWIC to sell their insurance products. T&A and Tobias (as the CEO of T&A) direct agents, including Phillips and Ventura, to sell these insurance products by using automatic telephone dialing services. (ECF No. 47, PageID.602–604.) These automatic telephone dialing services engage in unlawful activities, such as deliberately calling telephone numbers that appear on the DNC Registry. T&A, Tobias, and agents like Phillips and Ventura allegedly are aware that the services they use (or instruct others to use) engage in unlawful activity. (*Id.* at PageID.604.) Plaintiff states that Fidelity and GWIC are also aware of the "illegal tactics being used by their contracted call centers" and "support and facilitate" the activity by providing T&A with access to its systems and the authority to use their name and market their insurance products. (*Id.* at PageID.606.) Based on his amended complaint, Plaintiff seeks to hold all Defendants vicariously liable for the call centers' and agents' actions, and wants to hold Defendants liable for all calls and for all counts. (*Id.* at PageID.598–601, 615–620.)

11

As such, Plaintiff "outlined each defendant's role in the violations he alleges"; therefore, "it is not problematic that Dobronski asserts each Count against all defendants." *Dobronski v. Fam. First Life, LLC*, No. 2:22-CV-12039, 2024 WL 575858, at *22 (E.D. Mich. Jan. 19, 2024), *report and recommendation adopted in part, rejected in part*, No. 22-CV-12039, 2024 WL 1342668 (E.D. Mich. Mar. 29, 2024); *see also Fam. First Life, LLC*, 2024 WL 1342668, at *11 ("Dobronski has outlined each Defendant's role in the violations he alleges, providing sufficient clarity into which Defendants are liable for which calls."). As such, Plaintiff's amended complaint does not violate Federal Rule of Civil Procedure 8.

## B. Defendants' Connection with Calls 1-11

All Defendants argue the amended complaint "do[es] not plausibly allege calls 1-11 were made by or on behalf of Defendants." (ECF No. 51, PageID.673; *see also* ECF No. 50, PageID.643–644; ECF No. 52, PageID.701–704.) According to Defendants, the allegation that the twelve calls began with identical, prerecorded messages does not permit a reasonable inference that the same entities are responsible for all twelve calls. (ECF No. 50, PageID.644; ECF No. 51, PageID.675–676; ECF No. 52, PageID.701–704.)

12

Plaintiff heard an identical, pre-recorded message from "James" at "American Benefits" at the beginning of Calls 1-12. During the course of Calls 1-11, he was suddenly disconnected from the call during the pre-qualifying or qualifying stage and was not able to learn additional identifying information. (ECF No. 47, PageID.609–610.) However, he was able to learn additional information during Call 12, and, based on the identical, pre-recorded message in all twelve calls, infers that all twelve calls come from or are related to Defendants and their agents. (ECF No. 53, PageID.724–725 ("It is certainly not unreasonable to believe that, given that the recorded messages in Calls 1 through 12 were all <u>identical</u>, the same person or entity was responsible for the initiation of each of the calls.").)

Defendants take issue with this inference. The T&A Defendants argue that Plaintiff "fails to allege *facts* connecting any of the Defendants to the name of American Benefits" or to "those Caller ID numbers." (ECF No. 50, PageID.644.) However, the T&A Defendants do not explain why the identical pre-recorded messages are insufficient to connect all twelve calls. Further, the amended complaint explains that the "lead generators" working for automatic telephone dialing services often

13

"manipulate the caller identification such that the caller cannot be easily identified or call back," and use "a false or generic-sounding business name." (ECF No. 47, PageID.605.) As such, Plaintiff pleads sufficient facts connecting Defendants to the "American Benefits" name and these caller IDs because of the identical, pre-recorded messages and his allegations that automatic telephone dialing services take steps to obscure their identity and the identity of their principals.

Defendants also argue that Plaintiff's allegations linking Calls 1-11 to Defendant insurance companies are not plausible. (ECF No. 51, PageID.675–677; ECF No. 50, PageID.637; ECF No. 52, PageID.704.) According to Fidelity and GWIC, "telemarketers easily could have recycled the messages and the generic-sounding names of the callers for different sellers." (ECF No. 51, PageID.676; *see also* ECF No. 52, PageID.703–704.) Fidelity and GWIC urge the Court to consider allegations in another federal lawsuit filed by Plaintiff: *Dobronski v. Family First Life, LLC*, Case No. 22-12039 (E.D. Mich.). In *Family First Life*, Plaintiff alleged that he received calls from people purporting to be from "American Benefits," and states that these "American Benefits" agents solicited him for products from Family First Life, LLC and

14

Americo Financial Life. (ECF No. 51, PageID.676 (citing *Dobronski v. Family First Life, LLC*, Case No. 22-12039, ECF No. 1, PageID.44–46 (E.D. Mich.)); ECF No. 52, PageID.702–704.) Fidelity and GWIC argue that the Court cannot reasonably infer that Calls 1-11 were made on behalf of Defendants "[b]ecause the 'American Benefits' marketing name was used to solicit the products and services of at least five entities [including Americo and Family First Life] . . . during the same time period Plaintiff alleges he received solicitations for Defendants' products and services." (ECF No. 51, PageID.676–677; *see also* ECF No. 52, PageID.703–704.) Finally, Fidelity and T&A suggest that "the reasonable inference" to draw from Plaintiff's allegations is that Calls 1-11 "were initiated to solicit different products and services" and "were not made by or on behalf of Defendants." (ECF No. 51, PageID.678; ECF No. 50, PageID.637.)

The Court declines to follow Defendants' reasoning because it does not conform with the motion to dismiss standard. When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys*, 684 F.3d at 608. The complaint must state a

15

plausible claim for relief, and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

At this stage of the case, the Court must construe the complaint in the light most favorable to Plaintiff, and Plaintiff's pleadings regarding these identical, pre-recorded messages indicate a connection between all the calls and Defendants. Defendants' theories that the "James with American Benefits" pre-recorded message may be "recycled" by other telemarketers or used when marketing products from other insurance companies could be true, but the Court "[is] not convinced that it is such 'an obvious alternative explanation,' that [Plaintiff's] alternate theory cannot clear the plausibility bar." *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 562 (6th Cir. 2022) (quoting *Twombly*, 550 U.S. at 567).

Additionally, the "American Benefits" calls in *Family First Life* are different than the identical, pre-recorded messages in this case. In *Family First Life*, Plaintiff alleges that the people who identified as employees or agents of "American Benefits" were live telemarketing agents. (ECF No. 52, PageID.702–793 (quoting *Family First Life*, Case

16

No. 22-12039, ECF No. 99, PageID.1023–1024, 1043–1044 (E.D. Mich.)).)
*Family First Life* does not involve a similar or identical pre-recorded
message as alleged in this case.

Finally, Defendants' suggestion that Calls 1-11 "were initiated to
solicit different products and services" does not suggest that Calls 1-11
were not made on behalf of Defendants. (ECF No. 51, PageID.677; ECF
No. 50, PageID.637.) Construing the amended complaint in the light most
favorable to Plaintiff, *Keys*, 684 F.3d at 608, it may be that Plaintiff did
not qualify for other insurance products issued by these same
Defendants, or that the phone line disconnected during Calls 1-11 for
reasons unrelated to his qualification for the products. (*See* ECF No. 53,
PageID.719 ("[T]he automated telephone dialing system has technical
reliability issues as, during the course of Call 12, the conversation with
Ventura suddenly disconnected . . . Ventura then dialed Plaintiff back.").)

The Court reminds the parties that its determination here is only
that of plausibility, not actual fact. *See Keys*, 684 F.3d at 608. After
discovery is conducted, the evidence may demonstrate that Defendants
are correct, and these eleven calls have no connection to them. On the
other hand, there may be evidence that these eleven calls were placed on

17

behalf of Defendants. At this point, the Court declines to dismiss allegations regarding Calls 1-11.

### C. Call 13

Plaintiff alleges that Call 13 violated the TCPA's prohibition on calling telephone numbers on the DNC Registry, 47 C.F.R. § 64.1200(c)(2), and the TCPA's requirements that certain disclosures be made during telemarketing calls, 47 C.F.R. § 64.1200(d)(4). (ECF No. 47, PageID.617–618.) Plaintiff also alleges that Call 13 violated the MHSSA and the FTSA. (*Id.* at PageID.619.)

GWIC states, almost in passing, "Plaintiff cannot hold GWIC or any other defendant liable for Call 13 because he acknowledges consenting to the call." (ECF No. 52, PageID.705.) GWIC suggests that consent was given because Plaintiff "feigned interest in receiving" Call 13. (ECF No. 57, PageID.792.) GWIC does not explain why Plaintiff's behavior would constitute consent pursuant to the TCPA, the MHSSA, or the FTSA, and does not provide a legal basis for this conclusion in its motion to dismiss or its reply memorandum. (ECF No. 52, PageID.705; ECF No. 57, PageID.792.)

18

Plaintiff argues the TCPA requires "express consent," not implied or presumed consent, and that he did not allege facts consistent with express consent regarding Call 13. (ECF No. 55, PageID.773–774.) Plaintiff contends that, even if he had consented, the caller was still required to make certain disclosures required by the TCPA. (*Id.*)

        i.     *Count V: 47 C.F.R. § 64.1200(c)(2)*

Pursuant to the TCPA's implementing regulations, entities may not "initiate any telephone solicitation to[] [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). A person or entity making a telephone solicitation cannot be held liable for initiating a call to telephone number on the DNC Registry if "it has obtained the subscriber's prior express invitation or permission," evidenced by "a signed, written agreement," or if the telemarketer has a personal relationship with the recipient of the call. *Id.*; 47 C.F.R. § 64.1200(f)(15)(ii).[2]

---

[2] 47 C.F.R. § 64.1200(f)(15)(i) states that "telephone solicitations" do not include calls "to any person with that person's prior express invitation or permission."

Here, Plaintiff received Call 12 on February 2, 2023 at 12:33 P.M. (ECF No. 47, PageID.608.) During Call 12, he eventually spoke with Ventura, who began soliciting Plaintiff for policies with Fidelity and Western. (*Id.* at PageID.610–611.) "As Ventura was asking for Plaintiff's bank account information, the call suddenly disconnected and Plaintiff received a recorded message which stated: 'You have been kicked from this conference.'" (*Id.* at PageID.611.) Plaintiff received Call 13 that same day, at 12:44 P.M., which is eleven minutes after he received Call 12. (*Id.*) The caller was Ventura and Ventura continued soliciting Plaintiff for the same policies he described in Call 12. (*Id.* (describing that Ventura "resumed the telephone solicitation").)

---

This exception, however, does not conform with the "signed, written agreement" requirement for prior express invitation or permission in 47 C.F.R. § 64.1200(c)(2). It is not clear to the Court why § 64.1200(c)(2) would require a signed, written agreement for a showing of express permission to receive a telephone solicitation (despite one's number being on the DNC Registry) when telephone solicitations do not include calls with express permission (written or not).

At least one court has utilized the "signed, written agreement" exception, instead of the more lenient exception that does not require a written agreement, when analyzing calls to telephone numbers on the DNC Registry. *Blalack v. RentBeforeOwning.com*, No. LACV2109048JAKAFMX, 2022 WL 7320045, at *4 (C.D. Cal. Oct. 11, 2022). Additionally, the parties do not address this issue. As such, the Court will assume that a signed, written agreement is required for consent to receive a telephone solicitation, when one's number is on the DNC Registry.

20

Plaintiff does not allege that he had a signed, written agreement with any Defendant giving his prior, express invitation or permission to call, or that he had a personal relationship with any Defendant. (ECF No. 47.) As such, GWIC's argument that Plaintiff consented to Call 13 is denied and Plaintiff's claim that Call 13 violated the TCPA's prohibition on calling numbers on the DNC Registry remains in the case.[3]

###### ii.   Count VI: 47 C.F.R. § 64.1200(d)(4)

As to Plaintiff's other TCPA claim related to Call 13, the TCPA requires a "person or entity making an artificial or prerecorded-voice telephone call . . . for telemarketing purposes [to] provide the called party with the name of the individual caller, the name of the person or entity

---

[3] At this time, the Court holds no opinion on whether Call 13 falls under the "established business relationship" exception described in 47 C.F.R. § 64.1200(c)(2). An "established business relationship" can be "formed by a voluntary two-way communication . . . with or without an exchange of consideration . . . on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party." 47 C.F.R. § 64.1200(f)(5); *see also Blalack*, 2022 WL 7320045, at *4.

The Court notes that "inquiry or application" is not defined in the TCPA's implementing regulations. Further, the parties do not address this issue, and the facts in this case have yet to be developed. As such, the Court will not consider this issue at this time.

21

on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." 47 C.F.R. § 64.1200(d)(4). Plaintiff's claim that Call 13 violated § 64.1200(d)(4) must be dismissed because he does not allege that Call 13 involves "an artificial or prerecorded-voice telephone call."

### iii.   Count VIII: MHSSA

The MHSSA prohibits telephone solicitors from making "a telephone solicitation to a residential telephone subscriber whose name and residential telephone number is on the [DNC Registry]." Mich. Comp. Laws § 445.111a(5). It also states, "[a]t the beginning of a telephone solicitation, a person making a telephone solicitation to a residential telephone subscriber shall state his or her name and the full name of the organization or other person on whose behalf the call was initiated and provide a telephone number of the organization or other person on request." Mich. Comp. Laws § 445.111b(1).

The Court dismisses these claims as to Call 13 because Call 12 and 13 constitute one, single telephone solicitation.[4] Based on Plaintiff's

---

[4] The Court notes that the TCPA defines "telephone solicitation" as "the initiation of a telephone call," 47 C.F.R. § 1200(f)(15), while the MHSSA defines

allegations, the Court must reasonably conclude that Calls 12 and 13 constitute one, inseparable telephone solicitation for purposes of his MHSSA claim: Ventura was the solicitor on both calls, the calls occurred within mere minutes of each other and concerned the same exact products, and there are strong indications (Plaintiff's allegation that the call disconnected in the middle of a question, Ventura's alleged statements and behavior) that Call 12's disconnection was unintentional.[5] As such, Plaintiff's claims that Call 13 violated Mich. Comp. Laws §§ 445.111b(1) and 445.111a(5) are dismissed.

The MHSSA also prohibits telephone solicitors from "intentionally block[ing] or otherwise interfere[ing] with the caller ID function on the telephone of a residential telephone subscriber to whom a telephone solicitation is made so that the telephone number of the caller is not displayed on the telephone of the residential telephone subscriber." Mich.

---

"telephone solicitation" as "any voice communication over a telephone." Mich. Comp. Laws § 445.111(m). Call 13 was an additional "initiation of a telephone call," but was a continued "voice communication" that began during Call 12.

[5] The Court does not suggest that multiple calls for the same product or by the same person should always be considered a single solicitation. The allegations that Calls 12 and 13 occurred within minutes of each other *and* that the disconnection was unintentional are essential to this analysis.

Comp. Laws § 445.111b(3). The Court dismisses this MHSSA claim as to
Call 13 because Plaintiff does not allege that the caller identification
information for Call 13 was blocked or interfered with.

As such, Plaintiff's MHSSA claims regarding Call 13 are dismissed.

>        iv.    *Count IV: FTSA*

Plaintiff alleges that Call 13 violated three provisions of the FTSA.
(ECF No. 47, PageID.619–620.) First, a telephone solicitor "who makes
an unsolicited telephonic sales call" must immediately provide certain
identifying information, like his true first and last name and the business
on whose behalf he is soliciting. Fla. Stat. § 501.059(2). Second, a person
may not make or "knowingly allow to be made" unsolicited telephonic
sales calls using automated calling systems or pre-recorded messages
without the express written consent of the called party. *Id.* §
501.059(8)(a). Third, a person making telephonic sales calls cannot
interfere with the transmission of Caller ID information, like the
originating telephone number and, in some cases, the name of the
telephone solicitor. *Id.* § 501.059(8)(b).

Because Plaintiff's allegations regarding Call 13 do not involve a
recorded message, an automated calling system, or interference with the

transmission of Caller ID information, Plaintiff's §§ 501.059(8)(a) and (8)(b) claims related to Call 13 must be dismissed.

As to Plaintiff's § 501.059(2) claim, Plaintiff alleges that Ventura did not immediately provide his true first and last name and the business on whose behalf he was soliciting. Instead, Ventura only provided "the generic name of 'The Enrollment Center'" as the business after Plaintiff asked. (ECF No. 47, PageID.611.) While the FTSA does not define "immediately," the Court finds that Plaintiff has plausibly alleged that Ventura did not immediately provide the name of his business during Call 13 because Ventura had to be prompted to provide it.[6] Additionally, the FTSA's exceptions do not apply here.

 FTSA defines an "unsolicited telephonic sales call" as a telephonic sales call that does not fall into one of four exceptions:

> 1. In response to an express request of the person called;
> 2. Primarily in connection with an existing debt or contract, if payment or performance of such debt or contract has not been completed at the time of such call;
> 3. To a person with whom the telephone solicitor has a prior or existing business relationship; or

---

[6] The Court notes that Ventura identified himself as "Jesse Ventura with 'The Enrollment Center'" during Call 12. (ECF No. 47, PageID.610.)

4. By a newspaper publisher or his or her agent or employee in connection with his or her business.

Fla. Stat. § 501.059(1)(k).

Here, Plaintiff does not allege that he made an "express request" for Call 13. While he heavily implied his consent to Call 13 due to his conduct during Call 12, such as providing canary trap information in response to pre-qualifying and qualifying questions, his conduct does not rise to the level required by § 501.059(1)(k). *See Express*, Black's Law Dictionary (12th ed. 2024) ("Clearly and unmistakably communicated; stated with directness and clarity."); *TSA Stores, Inc. v. Dep't of Agric. & Consumer Servs.*, 957 So. 2d 25, 29 (Fla. Dist. Ct. App. 2007) ("Voluntarily surrendering one's telephone number to a sales clerk might under some circumstances give an implied authority for the store to make a later telephonic sales call, but it certainly does not give an 'express' consent.").[7]

---

[7] As set forth before, the Court holds no opinion at this time whether Plaintiff had a "prior or existing business relationship" such that Call 13 was not an unsolicited telephonic sales call. In *TSA Stores, Inc.*, 957 So. 2d 25, a Florida state court noted that the FTSA does not define "prior or existing business relationship," but determined that "courts may properly be informed by case law or related statutory provisions that do give meaning to the term." *Id*. at 29. As a result, the *TSA Stores* court adopted the definition of "established business relationship" in 47 C.F.R.

As such, Plaintiff's FTSA Claim with regard to Call 13 may remain in the case at this time.

## D. Vicarious Liability for the TCPA

Defendants argue that Plaintiff fails to plead Defendants' vicarious liability for these actions. (ECF No. 50, PageID.644; ECF No. 51, PageID.670; ECF No. 52, PageID.699.)[8]

The TCPA allows for vicarious liability. *Lucas v. Telemarketer Calling From (407) 476-5680*, No. 18-3633, 2019 WL 13545379, at *4 (6th Cir. Nov. 1, 2019). Courts in the Sixth Circuit determine TCPA vicarious liability using traditional agency theories.[9] *Fam. First Life, LLC*, 2024

---

§ 64.1200(f)(4) to define "prior or existing business relationship" in the FTSA. The Court previously declined to consider whether Plaintiff had established a business relationship pursuant to 47 C.F.R. § 64.1200(f)(4) during Call 12. The Court will also do so here.

[8] Many of GWIC's arguments on specific counts appear to be vicarious liability arguments. (ECF No. 52, PageID.705 (arguing that facts regarding Call 12 were insufficiently pled for vicarious liability as to GWIC); *id.* at PageID.707 (arguing that Plaintiff's MHSSA claim fails because he has not alleged GWIC's involvement with the calls).) As such, the Court addresses all of those arguments in this section.

[9] The Court notes that traditional agency theories are not exclusively used to determine TCPA vicarious liability. In *Lucas*, 2019 WL 13545379, the Sixth Circuit explained that the FCC does not rely on formal agency relationships when determining the vicarious liability of "platform providers" and instead uses a "totality

WL 1342668, at *7 (citing *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015)). As such, the Court must determine if Defendants delegated actual or apparent authority to place those calls, or if Defendants ratified the act through acceptance of benefits. *Jewell v. Magnolia Bank, Inc.*, No. 3:23-CV-78-RGJ, 2024 WL 203972, at *3 (W.D. Ky. Jan. 18, 2024).

"[A]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Keating*, 615 F. App'x at 373 (quoting Restatement (Third) of Agency § 2.01)). An agent acts with apparent authority when a third-party reasonably believes the agent has authority to act and that belief is traceable to a manifestation by the principal. *In the Matter of the Joint Petition Filed by Dish Network, LLC,*

---

of the circumstances" test. *Id.* at *4 (quoting *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C.R. 7961, 7980 (2015)).

A "platform provider" is a "software or a platform that facilitates calling, or hosting a calling service." *In Re Rules & Regulations*, 30 F.C.C.R. at 7979. Because none of the Defendants are "platform providers," the Court will continue to use traditional agency theories in determining whether they are vicariously liable for the alleged violations.

28 F.C.C.R. 6574, 6586 (2013). Finally, ratification occurs when the principal knowingly accepts the benefits of another's actions "through conduct justifiable only on the assumption that the [principal] consents to be bound by the act's legal consequences." *Id.*

          *i.*    *The T&A Defendants*[10]

The T&A Defendants (T&A, Tobias, Phillips, and Ventura) argue that the amended complaint "lacks factual allegations concerning an agency relationship" and, as such, Plaintiff has failed to plead vicarious liability. (ECF No. 50, PageID.645–646.) According to the T&A Defendants, the amended complaint does not contain "allegations that Defendants granted actual authority to anyone to place calls in violation of the TCPA or controlled the manner and means of the calls identified in Plaintiff's Complaint." (*Id.*)

In support of its motion, the T&A Defendants cite *Seri v. Crosscountry Mortgage, Inc.*, No. 1:16-CV-01214-DAP, 2016 WL 5405257,

---

[10] Plaintiff suggests that T&A may be directly liable for the calls because it may directly operate the call center. (ECF No. 53, PageID.725.) The amended complaint alleges that call centers "initiat[e] the automated telemarketing calls <u>on behalf of</u> T&A." (ECF No. 47, PageID.604 (emphasis added).) Plaintiff's allegations do not support an inference that T&A operates the call center or actually placed the calls. As such, Plaintiff has not sufficiently pled direct liability as to T&A.

at *5–6 (N.D. Ohio Sept. 28, 2016). In *Seri*, the court found that the plaintiff had not sufficiently pled an agency relationship because the only allegation linking them was a website set up by one entity that sent leads to the other. *Id.* Unlike *Seri*, Plaintiff's amended complaint contains numerous allegations connecting the T&A Defendants with the alleged conduct, such as their knowledge of the unlawful actions, connections between the solicitation and these Defendants, and the benefits these Defendants received as a result. Other courts have found vicarious liability when analyzing similar pleadings. *See Fam. First Life, LLC*, 2024 WL 575858, at *11–12.

First, Plaintiff has sufficiently pled vicarious liability as to T&A and Tobias. Plaintiff alleges that T&A knowingly provides its agents with "telemarketing leads" and access to automatic telephone dialing services, which call numbers generated via random number or sequential number generator and initiate calls without human involvement. (ECF No. 47, PageID.603–604.) T&A and Tobias (as the CEO of T&A) allegedly promote the use of these automatic telephone dialing services to their agents and are aware that the services and the telemarketing activities its agents conduct are illegal and violate the TCPA. (*Id.* at PageID.604–

606.) *See Ramsey v. Receivables Performance Mgmt., LLC*, No. 1:16-CV-
1059, 2018 WL 11312532, at *5 (S.D. Ohio Jan. 23, 2018) (denying motion
to dismiss as to the "highest-ranking officer" of the defendant company
because the plaintiff alleged that the officer was "responsible for all []
business operations and that he was in charge of implementing TCPA
procedures . . . .").

As to Ventura, Plaintiff states that T&A's agents (including
Ventura) are aware that the services and the telemarketing activities
they or its agents conduct are illegal and violate the TCPA. (ECF No. 47,
PageID.604–606.) Plaintiff alleges that T&A does business using the
name "GETMEHEALTHCARE.COM" and "ENROLLMENT CENTER,"
(*id.* at PageID.586), and Ventura identified himself as an employee or
agent of "The Enrollment Center." (*Id.* at PageID.610.) Additionally, on
Call 12, Plaintiff was forwarded to Ventura after finishing the pre-
qualification and qualification process, which indicates that the initiation
of Call 12 and the manner it was conducted were done at his direction.
(*Id.*) *See also Family First Life*, 2024 WL 575858, at *12 (finding that
Plaintiff sufficiently alleged vicarious liability as to individual agents
who were "connected to the originating and allegedly tortious calls . . .

31

through the transfer of calls to them, or by sending Dobronski insurance applications"). Ventura also appears to have initiated Call 13 himself. (ECF No. 47, PageID.611.) Because of Ventura's connection to Calls 12 and 13, Plaintiff has sufficiently pled vicarious or direct liability as to Ventura for these calls. However, the Court dismisses claims against Ventura related to Calls 1-11 because Plaintiff does not allege any connection between Ventura and these previous calls.

As to Phillips, he is "an authorized agent of Western" and allegedly emailed Plaintiff during Plaintiff's call with "Eric." (*Id.* at PageID.612.) Phillips' email address was listed on the Western email and application as phillipsma@getmehealthcare.com," (which presumably identifies him as part of "GETMEHEALTHCARE.COM") (*id*), and "Eric" allegedly identified Phillips as his manager. (*Id.* at PageID.613.) Plaintiff's allegations regarding Phillips are sufficient for a finding of vicarious liability at this time because he emailed Plaintiff the insurance application, he was listed in the application as "an authorized agent of Western," and he was a "manager" for "Eric." *See Family First Life*, 2024 WL 575858, at *12 (finding that individual agents were "all connected to

the originating and allegedly tortious calls . . . either through the transfer of calls to them . . . or by sending Dobronski insurance applications").

Finally, Plaintiff alleges that the T&A Defendants benefit monetarily from these actions. (ECF No. 47, PageID.603.) The Court finds that Plaintiff's allegations are sufficient for a finding of vicarious liability.

As such, the T&A Defendants' arguments regarding vicarious liability are denied.

### ii.    Fidelity

Fidelity challenges Plaintiff's amended complaint on the basis of vicarious liability. According to Fidelity, Plaintiff has not pled actual authority because "[n]othing in the FAC supports the inference that Fidelity had the right to control the call centers' conduct." (ECF No. 51, PageID.670.) Fidelity believes Plaintiff only alleges a contractual relationship between Fidelity (and other Defendants) and the call centers, and that the mere existence of a contract is not sufficient to demonstrate actual authority. (*Id.*) Fidelity also argues that Plaintiff has not pled apparent authority because "the Court cannot reasonably infer . . . that Fidelity held the call centers out to Plaintiff as having the

33

authority to engage in the conduct at issue." (*Id.* at PageID.671–672.)
Additionally, Fidelity believes Plaintiff has not pled ratification because
he did not allege that "Fidelity accepted any benefits as a result of the
call centers' calls to Plaintiff," noting that "Plaintiff submitted a life
insurance application to Fidelity in connection with the February 2nd
call, but Fidelity cancelled the application immediately." (*Id.* at
PageID.672.) Lastly, Fidelity argues that Plaintiff fails to allege that
Fidelity "was aware of the call centers' allegedly illegal activities." (*Id.*)

Plaintiff sufficiently alleges vicarious liability as to Fidelity: the
amended complaint describes Fidelity's alleged support and facilitation
of the "scheme" by "providing [] T&A and its Agents with access to
[Fidelity's] computer systems for pricing; the ability to enter data into
[Fidelity's] systems; the authority to use [Fidelity's] trade name and
trademark or service mark; and . . . the authority to market [Fidelity's]
insurance products." (ECF No. 47, PageID.605–606.) Plaintiff was
solicited for a Fidelity life insurance product by "Eric" with
"GETMEHEALTHCARE.COM," and, while on the phone with Eric,
Plaintiff received an email from Fidelity on February 2, 2023, at 1:19
P.M. with a "copy of a Fidelity application for life insurance" that

34

included his "canary trap" information and Tobias' electronic signature. (*Id.* at PageID.612–614.) Plaintiff also received a letter on Fidelity letterhead, dated February 3, 2023, stating that the Fidelity product was issued to his "canary trap" name and providing payment instructions. (*Id.* at PageID.614.)

At this stage of the case, these allegations are sufficient for a showing of apparent authority or ratification. Fidelity's communications with Plaintiff – the February 2, 2023 1:19 P.M. email, which was sent while Plaintiff was on the phone with "Eric," and the letter dated February 3, 2023 – could reasonably make a third-party believe that Fidelity's agents (the callers) had authority to act on Fidelity's behalf. *Dish Network, LLC*, 28 F.C.C.R. at 6586. Further, Fidelity allegedly "ratified the behavior by knowing about it and nonetheless sending applications or policies." *Family First Life*, 2024 WL 1342668, at *10. Other courts in the Sixth Circuit have found similar allegations sufficient for vicarious liability at the motion to dismiss stage. *See id.*

As to Fidelity's argument that Plaintiff fails to plead ratification because Fidelity "cancelled" his application after receiving it (ECF No. 51, PageID.672), the Court first notes that Fidelity did not provide any

citations or caselaw indicating that an application, in and of itself, cannot be considered a benefit under federal common-law ratification. (*Id.* at PageID.672–673.)

Second, construing the complaint in the light most favorable to the plaintiff, *Keys*, 684 F.3d at 608, it is not clear if Fidelity cancelled Plaintiff's application. "On February 2, 2023, at 1:25 P.M., Plaintiff received an email from Fidelity at the 'canary trap' email address which stated that the application had been 'cancelled to edit application.'" (ECF No. 47, PageID.614.) Plaintiff received this email less than ten minutes after receiving his first email from Fidelity. (*Id.* at PageID.613.) However, Plaintiff also received a letter from Fidelity dated February 3, 2023, stating that the policy was issued and providing payment instructions. Based on these allegations, the Court is unable to discern what occurred when Fidelity sent the "cancelled to edit application" email. Finally, Plaintiff's receipt of the letter dated after the "cancellation" email, with payment instructions and policy information, indicates that Fidelity may not have cancelled his application at that time.

As such, Plaintiff's allegations are sufficient to allege apparent authority or ratification for Fidelity.

36

### iii.   GWIC

Like Fidelity, GWIC argues that Plaintiff has not alleged vicarious liability. (ECF No. 52, PageID.699.) GWIC also contends that Plaintiff fails to allege ratification because he "does not allege any conduct by GWIC that would manifest assent in any allegedly illegal telemarketing activity" and because GWIC did not accept any benefits. (*Id.* at PageID.700–701 (stating that GWIC did not accept any benefits because "no policy was issued and no payment was made"); *see also id.* at 706–707 (contending that Plaintiff's Michigan law claims fail because he does not allege GWIC initiated or was involved with the calls).)

Plaintiff sufficiently alleges vicarious liability as to GWIC. Like Fidelity, he claims that GWIC is aware of the call centers' illegal telemarketing activities and supports the "scheme" by providing T&A and its Agents with access to its computer systems, the ability to enter information into these systems, the authority to use GWIC's name, and the authority to market GWIC's products. (ECF No. 47, PageID.605–606.) Further, Plaintiff was "sold" a GWIC policy by Ventura and received an email from GWIC on February 2, 2023 at 1:09 P.M. while on the phone with "Eric" at "GETMEHEALTHCARE.COM." (*Id.* at PageID.611–612.)

37

This email included a GWIC application for life insurance with his "canary trap" information and a signature from Phillips, who was listed as an authorized GWIC agent. (*Id.* at PageID.612.)

These allegations are sufficient for a showing of apparent authority or ratification at the motion to dismiss stage. GWIC communicated with Plaintiff through the February 2, 2023 1:09 P.M. email, which was sent while Plaintiff was on the phone with "Eric," and this email could reasonably lead a third-party to believe that the caller had authority to act on behalf of GWIC. *Dish Network, LLC*, 28 F.C.C.R. at 6586.

GWIC's argument that ratification did not occur because it did not issue a policy or receive payment is not convincing. GWIC does not provide any citations indicating that their sending the application is not sufficient to be a "benefit" under federal common-law. As indicated in *Family First Life*, ratification can occur when a principal knew about the behavior but "nonetheless [sent] applications or policies." *Family First Life*, 2024 WL 1342668, at *10.

As such, Plaintiff's allegations are sufficient to allege apparent authority or ratification for GWIC.

38

### E. Count IX: FTSA

      *i.    Article III Standing*

Fidelity argues that Count IX, Plaintiff's claim under the Florida Telephone Solicitation Act, should be dismissed for lack of Article III standing. According to Fidelity, "[c]ourts considering FTSA standing in the context of unsolicited text messages have held that the receipt of a handful of messages is not sufficiently concrete to satisfy Article III standing requirements." (ECF No. 51, PageID.678.) Because a "handful" of unwanted text messages have been found to be insufficient for standing purposes, Fidelity believes Plaintiff's allegations of a handful of unwanted phone calls are similarly insufficient. Fidelity also claims that "Plaintiff does not allege that [these] call[s] interrupted (or in any way disrupted) his domestic peace or home life," demonstrating a lack of injury. (*Id.* at PageID.679.)

In support of this argument, Fidelity cites an Eleventh Circuit opinion, *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), which held

that a single text message sent in violation of the TCPA was not a concrete injury.[11] (*Id.* at PageID.678.)

As discussed by Plaintiff, *Drazen v. Pinto*, 74 F.4th 1336 (11th Cir. 2023), an *en banc* Eleventh Circuit opinion, abrogated *Salcedo* and held that a single, unwanted text message may constitute a concrete injury. *Id.* at 1345–46; (*see also* ECF No. 54, PageID.750–751.) Plaintiff also alleges harm due to the calls. (*Id.* at PageID.751; *see also* ECF No. 47, PageID.601 (describing the calls as a "nuisance and annoyance" and an "occupation of the telephone line").).

The Court agrees with Plaintiff. Plaintiff alleges a concrete injury for Count IX, and all other Counts. (ECF No. 47, PageID.601–602.) Further, *Drazen* strongly supports a finding of concrete injury. The *Drazen* court acknowledged that "a single unwanted text message may not be highly offensive to the ordinary reasonable man," but may nonetheless cause a concrete injury. *Drazen*, 74 F.4th at 1345 (articulating that "the Constitution empowers Congress to decide what degree of harm is enough so long as the harm is similar in kind to a

---

[11] In addition to *Salcedo*, Fidelity cites several district court cases, all of which rely on *Salcedo*. (ECF No. 51, PageID.678 (collecting cases).)

traditional harm" and an unwanted text is similar to "the tort of intrusion upon seclusion") (internal citations omitted). As such, Count IX is not dismissed.

ii.   *The FTSA's Scope*

GWIC challenges Plaintiff's FTSA claim, stating "the FTSA's scope is limited to calls to Florida residents or to consumers in Florida," and "Plaintiff does not plausibly allege that he was in Florida when he received any call or that he is a Florida resident." (ECF No. 52, PageID.708 (citing *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334 (S.D. Fla. 2022)).) GWIC believes that the FTSA is limited to calls received by Florida residents or people in Florida because the FTSA provides,

> [t]here is a rebuttable presumption that a telephonic sales call made to any area code in this state is made to a Florida resident or to a person in this state at the time of the call.

Fla. Stat. § 501.059(8)(d). GWIC also relies on *Turizo*, which held that the FTSA does not violate the Dormant Commerce Clause in part because it does not regulate conduct wholly outside of Florida. *Turizo*, 603 F. Supp. 3d at 1346–47. In this analysis, the *Turizo* court used the FTSA's

rebuttable presumption clause as an example of the kind of connection to Florida a call must have for it to fall within the FTSA's scope. *Id.*

Telephone calls may fall within the FTSA's limited scope in two ways: it must be received by a Florida resident or a person in Florida, or it must be made by an entity in Florida. *See id.* (stating that the FTSA "limit[s] [its] scope to calls from Florida or to consumers in Florida"); Fla. Stat. § 501.059(1)(e). The text of the FTSA supports this interpretation. It defines "telephone solicitor" as a person, corporation, or other entity "doing business in this state, who makes or causes to be made a telephonic sales call . . . ." Fla. Stat. § 501.059(1)(i). "Doing business in this state" is defined as "businesses that conduct telephonic sales calls from a location in Florida or from other states or nations to consumers located in Florida." Fla. Stat. § 501.059(1)(e).

Plaintiff argues that all alleged calls fall within the scope of the FTSA because the T&A Defendants are located in Florida; thus, "[i]t is also reasonable to conclude that the call center is likely located in Florida." (ECF No. 55, PageID.776 (citing ECF No. 47, PageID.611).) However, the amended complaint alleges that call centers "initiat[e] the automated telemarketing calls <u>on behalf of</u> T&A." (ECF No. 47,

PageID.604 (emphasis added).) Plaintiff's allegations support a reasonable inference that Ventura and the other T&A Defendants are located in Florida and that the call centers transfer calls to Ventura (and other T&A Agents), but not that the call centers initiate or conduct these calls from a location in Florida.

The plain text of the FTSA requires the call to be "conduct[ed] . . . from a location in Florida or from other states or nations to consumers located in Florida." Fla. Stat. § 501.059(1)(e). Because the amended complaint does not support a reasonable inference that Calls 1-12 were conducted from a location in Florida, Plaintiff's FTSA claim is dismissed.

However, the amended complaint supports a reasonable inference that Call 13 was conducted from Florida. Plaintiff alleges that he was called on February 2, 2023 at 12:44 P.M. by Ventura, who stated "they were located in Florida," and the displayed caller ID number had a Florida area code. (ECF No. 47, PageID.611.) As such, Plaintiff's FTSA claim related to Call 13 remains in the case.

### F. Count VII: MTCCCA

Pursuant to Mich. Comp. Laws § 484.125(2), a caller may not use a telephone line to either (a) "[d]eliver a recorded message for the purpose

43

of presenting commercial advertising to the subscriber" without knowing and voluntary consent, or (b) "[d]eliver . . . intrastate commercial advertising if the caller activates a feature to block the display of caller identification information that would otherwise be available to the subscriber."

GWIC asks the Court to dismiss Plaintiff's MTCCCA claims. It argues that Plaintiff fails to plead a claim under Mich. Comp. Laws § 484.125(2)(a) because GWIC did not use a telephone line to deliver a recorded message. (ECF No. 52, PageID.706.) This argument does not hold merit. GWIC does not provide any legal support that a defendant cannot be held vicariously liable for an MTCCCA violation. (*Id.* at PageID.705–706.) The Court previously held that Plaintiff sufficiently alleged vicarious liability as to GWIC, *see supra* III.D.iii, and other courts have permitted MTCCCA claims against persons or entities that did not themselves place an unlawful call, presumably because of vicarious liability. *Fam. First Life, LLC*, 2024 WL 1342668, at *15 (declining to dismiss MTCCCA claim against individual defendants who allegedly placed the specific calls, the company that employed or otherwise controlled those individual defendants, and insurance companies for

44

whom the calls were placed); *see also Dobronski v. Transamerica Life Ins. Co.*, 347 Mich. App. 92, 97–98 (2023) (MTCCCA claim against insurance company, an employee of the insurance company, and an independent contractor). As such, Plaintiff's claim pursuant to Mich. Comp. Laws § 484.125(2)(a) will not be dismissed.

Next, GWIC contends that Plaintiff's claim pursuant to Mich. Comp. Laws § 484.125(2)(b) must be dismissed because the call must be intrastate. (ECF No. 52, PageID.706.) Pursuant to Mich. Comp. Laws § 484.125(1)(c), "intrastate" is defined as "originating and delivering within this state."

For Calls 1-12, the caller ID displayed telephone numbers beginning with a Michigan area code (either 734 or 269). Plaintiff states this demonstrates "that the calls originated on the public switched telephone network in Michigan . . . making the calls intrastate." (ECF No. 47, PageID.618.) However, Plaintiff also alleges that "[t]he call centers initiating the automated telemarking calls on behalf of T&A are believed to be located outside of the United States" (*Id.* at PageID.604) and the caller ID "was manipulated to display false information," including the purported telephone numbers. (*Id.* at PageID.610.) Because

45

of these inconsistencies, GWIC says that Plaintiff does not "plausibly allege the calls originated in Michigan." (ECF No. 52, PageID.706–707.)

Plaintiff admits that these facts are contradictory, but contends he is permitted to "state as many separate claims or defenses as [he] has, regardless of consistency" pursuant to Federal Rule of Civil Procedure 8(d)(3). (ECF No. 55, PageID.775.) The Court agrees. *See Son v. Coal Equity, Inc.*, 122 F. App'x 797, 802 (6th Cir. 2004) ("[T]he Federal Rules of Civil Procedure permit pleading in the alternative and even the pleading of inconsistent claims."). For example, plaintiffs may assert "inconsistent claims of both negligence and intentional torts arising from the same conduct," even though both cannot be true, as long as the plaintiff pleads a plausible claim for relief. *See Clemons v. Couch*, No. 6:17-CV-63-HAI, 2018 WL 11463802, at *1 (E.D. Ky. Jan. 3, 2018).

Here, Plaintiff plausibly alleges Calls 1-12 were initiated in Michigan because they had Michigan area codes displayed on the Caller ID. (ECF No. 47, PageID.608.) The display of Michigan area codes suggests the calls originated in Michigan, even though there are other indications that the calls did not originate in Michigan. At this stage of the case, the Court must construe the complaint in the light most

46

favorable to the Plaintiff. *Keys*, 684 F.3d at 608. As such, Plaintiff's MTCCA claims will remain in the case.

### G. Allegations Regarding Willful or Knowing Violations

GWIC argues that Plaintiff's claims regarding willful and/or knowing violations of the TCPA must be dismissed. (ECF No. 52, PageID.708.) Plaintiff pleads that all alleged violations of the TCPA were willful and/or knowing, and, as such, that he is entitled to treble damages. (ECF No. 47, PageID.621.) Plaintiff states the same for all alleged violations of the FTSA. (*Id.* at PageID.621–622.)

Plaintiff asserts that he received 12 Calls that violated the TCPA. (*Id.* at PageID.596–597; *see also id.* at PageID.615–618 (Counts I–VI).) The Court finds that Plaintiff has sufficiently pled that Calls 1-12 were willful violations of the TCPA's prohibition on calling phone numbers on the DNC Registry because his phone numbers were on the DNC Registry when he received the calls. *See Litz v. My Car Warrior, LLC*, 2020 WL 3546129, *4 (S.D. Ind. June 30, 2020) (telemarketing call to a number on the DNC Registry was a willful violation of the TCPA); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 662 (4th Cir. 2019) (finding a willful violation of the TCPA where defendant's agent calls numbers on

the DNC Registry or where a company is aware that its agent calls numbers on the DNC Registry but fails to act); *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 363 (E.D. Pa. 2019) (defendant's twenty-two calls to a number on the DNC Registry were each willful violations of the TCPA where defendant's business practice was to neither purchase the DNC Registry nor review it). Second, he alleges sufficient facts to state a claim that Calls 1-12 were willful violations of other TCPA prohibitions (Counts I–IV, VI). The Court finds that the alleged volume of calls, indicating repeated conduct, sufficiently alleges willful or knowing behavior at this time.

However, Plaintiff has not sufficiently alleged willful violations of the FTSA with regard to Call 13. While it is true Defendants remain liable for Call 13, *see supra* III.C.iv., Plaintiff's interactions with Ventura during Call 12 indicates that Ventura's call-back was not a willful violation of the TCPA. Accordingly, Plaintiff fails to state a claim that Call 13 was a willful violation of the FTSA.

## IV.  Conclusion

For the reasons set forth above, Defendants' motions to dismiss (ECF Nos. 49, 51, 52) are GRANTED IN PART AND DENIED IN PART.

The following claims remain in the case:

- Defendants T&A, Tobias, Phillips, Fidelity, GWIC:

  - Count I–IV, VI (TCPA), as to Calls 1-12, treble damages included;

  - Count V (TCPA), as to Calls 1-13, treble damages included only as to Calls 1-12;

  - Count VII (MTCCCA), as to Calls 1-12;

  - Count VIII (MHSSA), as to Calls 1-12;

  - Count IX (FTSA), as to Call 13, but only pursuant to Fla. Stat. § 501.059(2) and without treble damages.

- Defendant Ventura:

  - Count I–IV, VI (TCPA), as to Call 12, treble damages included;

  - Count V (TCPA), as to Call 13, without treble damages;

  - Count VII (MTCCCA), as to Call 12;

  - Count VIII (MHSSA), as to Call 12;

  - Count IX (FTSA), as to Call 13, but only pursuant to Fla. Stat. § 501.059(2) and without treble damages.

IT IS SO ORDERED.

Dated: March 7, 2025                     s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY
                                         United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 7, 2025.

                                         s/William Barkholz
                                         WILLIAM BARKHOLZ
                                         Case Manager